**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-4200**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JERMAINE DERRICK CARSON, JR.,

Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, Chief District Judge. (1:23-cr-00058-MR-WCM-1)

─────────────

Argued: May 6, 2026                                     Decided: July 8, 2026

─────────────

Before QUATTLEBAUM, BENJAMIN, and BERNER, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Benjamin wrote the opinion, in which Judge Quattlebaum joined and in which Judge Berner joined as to all but Section II-A. Judge Berner wrote an opinion concurring in the judgment.

─────────────

**ARGUED:** Melissa Susanne Baldwin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Asheville, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** John G. Baker, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant. Russ Ferguson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

─────────────

DEANDREA GIST BENJAMIN, Circuit Judge:

Officers found a firearm on Jermaine Derrick Carson, Jr.'s person when he was frisked during a traffic stop. Carson was eventually indicted and charged by a grand jury with possessing a firearm as a convicted felon. At the district court, Carson moved to suppress the firearm under the Fourth Amendment, arguing that the officers unreasonably extended the traffic stop and that the officers frisked him without reasonable suspicion. The district court denied his suppression motion, which Carson now appeals. For the reasons stated below, we affirm the district court's denial.

I.

A.

In 2023, the property manager at Aston Park Tower and Gardens[1] ("Aston Park") reported to the police that a group of young men had been frequenting the Aston Park parking lot and appeared to be engaged in drug trafficking. The report also mentioned that "people [were] walking around with guns." J.A. 157, 299–300.[2]

Asheville Police Department detectives Brad Beddow and Steven Escobedo began surveilling the Aston Park parking lot. Beddow and Escobedo observed Jermaine Derrick Carson, Jr., who typically arrived as a backseat passenger in a Toyota Highlander driven

---

[1] Aston Park Tower and Gardens is a public housing development that serves older residents in Asheville, North Carolina.

[2] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers for citations to the J.A. utilize the "JA#" numbering at the bottom of the page on each document.

2

by Calvin Washington. A woman later identified as Jordan Pressly usually sat in the Highlander's passenger seat. The detectives observed activity that was consistent with the property manager's report. That is, a group of young men going in and out of the Aston Park parking lot, although Carson was not seen engaging in any illegal activity. After investigating further, Beddow learned that Washington's driver's license was suspended.

A few weeks later, separate from surveillance of Aston Park, the Asheville Police Department's Impact Team collaborated with agents from the North Carolina Department of Public Safety's Alcohol Law Enforcement agency to patrol the bars in downtown Asheville. This was a joint operation to combat the high number of recent crimes involving firearms in and around the bars downtown. Beddow was a part of the joint operation and was assigned to surveil the bars on Banks Avenue. However, Beddow first went to a Shell gas station at 40 Merrimon Avenue. Beddow testified that he did so because from his experience, "problems would migrate" to that Shell. J.A. 153.

Soon after arriving at the Shell, Beddow spotted Washington and Pressly in the Highlander. As stated above, Beddow had seen them both a few weeks earlier during surveillance of Aston Park. Carson was also in the car, but Beddow did not see him. Washington went inside the Shell's convenience store and after exiting, he began to drive downtown toward Aston Park. Beddow then communicated via radio with others that were part of the joint operation to look out for the Highlander and to stop it before it got back to Aston Park, because conducting a traffic stop in Aston Park would be more dangerous. Detective Patrick DeStefano reached out to Beddow via radio and confirmed that Washington's license was still suspended.

3

Agent Web Corthell with the Alcohol Law Enforcement agency spotted the Highlander and was able to confirm the license plate. While Corthell followed the Highlander, it "picked up speed and began driving in a more aggressive manner." J.A. 190–91. Corthell then activated his emergency lights, and shortly thereafter the Highlander came to a stop.

The following stop of the Highlander involved four officers, who arrived at the scene in this order: Corthell, DeStefano, Officer Chase Hayes, and Escobedo.[3]

Corthell approached the Highlander's driver's side, and asked Washington if he had a driver's license. Washington admitted that he did not, but he handed Corthell his North Carolina identification card. DeStefano was shortly behind Corthell and was the second officer that responded to the traffic stop. Destefano approached the Highlander's passenger side and spoke to Carson and Pressly while Corthell was speaking to Washington. At 11:25:22 p.m., Corthell began to walk back to his vehicle to verify Washington's identification.

Hayes was the third to arrive on the scene and approached the Highlander's driver's side, which Corthell had just left. Hayes testified that at 11:25:52 p.m.—as he walked by the Highlander's rear driver's side window—he "could smell the odor of marijuana coming from inside the car." As Hayes began to chat with Washington, Destefano returned to his

---

[3] At the time of the joint operation, Corthell was with the Alcohol Law Enforcement agency, while DeStefano, Hayes, and Escobedo were with the Asheville Police Department. Escobedo had also been involved in surveillance of Aston Park in the weeks leading up to the Highlander traffic stop.

4

own patrol car.  While Hayes spoke with Washington, he noticed a knife between Washington's legs and a blue digital scale between the driver's and passenger's seats.

Corthell, upon arriving back at his patrol car, began the citation process.  He started by opening CJLEADS (a computer program that produces criminal histories) on his computer.  Corthell testified that he had not used CJLEADS in a while, so he had to complete a two-factor authentication process, which entailed first logging into CJLEADS, then receiving a notification from another secure source that Corthell needed to "check" before the system actually "log[ged] on."  J.A. 200.  After Corthell logged on, he entered Washington's name and identification number.  *Id.* 201, 209.  He then looked for Washington's address, date of birth, and information about why he did not have a valid driver's license.  He also checked for active warrants and investigated Washington's criminal history, noticing that Washington's criminal history prompted several system warnings.  These warnings included alerts that Washington was a felon, that he had previous drug offenses, and that police should approach him with caution.

Next, Corthell ran a check on the Highlander using the vehicle's North Carolina registration and found no issues.  J.A. 201.  Corthell also looked into the owner's driver's license and criminal history.  *Id.* 211.

Meanwhile, at 11:27:33 p.m., DeStefano was back at his patrol vehicle and was finishing up his records check on Carson.  Corthell walked over to DeStefano's patrol car to check in with him.  Corthell asked DeStefano if his body-worn camera was activated, and whether they should "bring a [drug-detecting] dog up here."  J.A. 116.  DeStefano

5

confirmed that his camera was activated and responded that he had not seen anything to warrant further investigation.

As Corthell began walking back to his car to write Washington's citation, Hayes told Corthell that he had seen drug paraphernalia in the Highlander. Hayes then went over to DeStefano and told him that he had probable cause to search the Highlander, explaining that he smelled marijuana and saw a digital scale with white residue on it.

Thus far, the sequence of events involving Corthell, DeStefano, and Hayes is as follows:

- Corthell activated his vehicle's emergency lights to pull over Washington.
- Corthell approached the Highlander's driver's side and asked Washington for his driver's license.
- DeStefano saw Corthell pull over Washington and came to assist. He began communicating with Carson and Pressley.
- At 11:25:22 p.m., Corthell started to walk back to his vehicle to begin verifying Washington's identification.
- At 11:25:52 p.m., Hayes arrived at the traffic stop and testified that he smelled an odor of marijuana as he walked by the Highlander's rear driver's side window.
- At 11:26:25 p.m., DeStefano walked back to his patrol car to check Carson's criminal history.
- At 11:27:33 p.m., while Hayes was communicating with Washington, he spotted a knife and blue digital scale in the Highlander.
- Also at 11:27:33 p.m., Corthell approached DeStefano for a brief check-in. They spoke for approximately 30 seconds about whether DeStefano's body-worn camera was activated, and whether any observations justified bringing a drug-sniffing dog to the scene.
- After their conversation ended, Hayes approached Corthell then DeStefano, informing them that he had seen drug paraphernalia and there was probable cause to search the Highlander.

Escobedo was the fourth and final officer to arrive on the scene. Upon arriving, Escobedo overheard Hayes tell DeStefano that he had smelled marijuana and seen a digital

6

scale. DeStefano walked to the driver's side of the Highlander and asked Washington to get out of the car while Escobedo approached the Highlander's rear-driver's side door and shined his flashlight into the car. Escobedo immediately recognized Carson and asked him to exit the vehicle. Escobedo smelled marijuana when Carson opened his door, and DeStefano detected the same odor as he conducted a search of the Highlander.

Escobedo then frisked Carson. As Escobedo began, he tried to pull up Carson's pants because they were "down near his knees." J.A. 43. But Escobedo was unable to pull Carson's pants all the way up as there was "something that was weighing the pants down." *Id.* 313. Escobedo asked Carson to spread his feet to facilitate the frisk, but Carson stated that he could not spread his feet. When Escobedo asked Carson why he could not spread his feet, Carson responded that he had a gun. Escobedo seized a nine-millimeter Glock pistol from Carson's right pants leg. The pistol was loaded and had one round in the chamber.

B.

A federal grand jury indicted Carson and charged him with possessing a firearm as a convicted felon, 18 U.S.C. § 922(g)(1). J.A. 11–12. Carson moved to suppress the firearm, arguing that Corthell extended the time necessary to perform the traffic stop and that he was frisked by Escobedo without reasonable suspicion that he was armed and dangerous. Carson argued that Corthell and Escobedo's actions violated his Fourth Amendment right to be free from unreasonable searches and seizures.

A magistrate judge conducted an evidentiary hearing on Carson's motion to suppress. The five officers involved in the stop testified and the magistrate judge watched

7

three of the officers' body-worn camera footage depicting the stop.  Notably, Hayes testified that on the evening of the stop at exactly 11:25:52 p.m., he detected the marijuana odor from the Highlander.  The magistrate judge recommended that the district court deny Carson's motion to suppress.  The magistrate judge found that Corthell did not unconstitutionally extend the traffic stop and that Escobedo's frisk of Carson was lawful.

Carson objected to the magistrate judge's memorandum and recommendation.  The district court overruled Carson's objections and denied his motion to suppress.  It found that the evidence supported the magistrate judge's finding that the police officers developed probable cause when Hayes detected the odor of marijuana in the Highlander while Corthell was in his patrol car.  J.A. 491–92.  The district court also held that Escobedo's frisk of Carson was lawful because Escobedo had reasonable suspicion that illegal drugs were in the Highlander before Carson was frisked.  *See id.* 493.

After the district court denied his motion to suppress, Carson entered a conditional guilty plea.  He agreed to plead guilty to possessing a firearm as a convicted felon, but preserved his right to appeal the district court's denial of his motion to suppress.  The district court accepted his plea and sentenced him to 24 months of imprisonment.  Carson timely filed a notice of appeal.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

When reviewing a denial of a motion to suppress, we review questions of law de novo and factual findings for clear error.  *United States v. Medley*, 34 F.4th 326, 332 (4th

8

Cir. 2022).  When "a motion to suppress has been denied, we view the evidence in the light most favorable to the government." *United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012) (citing *United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011)).  We " 'particularly defer to a district court's credibility determinations" because " 'it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress.' " *United States v. Purks*, 139 F.4th 388, 396 (4th Cir. 2025) (quoting *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021).

And when considering whether the police had sufficient suspicion to frisk Carson, we review de novo.  *United States v. Quarles*, 330 F.3d 650, 653 (4th Cir. 2003).

Carson does not challenge the traffic stop itself, or the officers' seizure of the car and its occupants.  Rather, Carson asserts that the traffic stop was unlawfully prolonged and the frisk lacked sufficient suspicion.  For the reasons set forth below, we hold that both were lawful and affirm the district court.

A.

We begin with the traffic stop.  The Fourth Amendment to the United States Constitution protects the rights of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Stopping a vehicle and "detaining its occupants constitute[s] a 'seizure' within the meaning of . . . [the Fourth] Amendment[]." *See Delaware v. Prouse*, 440 U.S. 649, 653 (1979) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543. 556–558 (1976)).  That "seizure" "justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

9

A routine traffic stop is more like a *Terry* stop than an arrest. *Id.* at 354. Its "tolerable duration" is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Officers are permitted to "conduct an investigation *unrelated* to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.' " *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 349). "Beyond determining whether to issue a traffic ticket, an officer's mission" during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. And because "[t]raffic stops are 'especially fraught with danger to police officers,' " *id.* at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)), an officer's "safety interest [also] stems from the mission of the stop itself." *Id.* Lastly, the Fourth Amendment permits an officer "to extend a traffic stop" to investigate additional criminal activity upon "reasonable suspicion" of that "criminal activity." *United States v. Smart*, 91 F.4th 214, 223 (4th Cir. 2024); *see also United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (holding that "an officer may extend a traffic stop when he possesses reasonable suspicion").

The Tenth Circuit helpfully articulated a three-part test for determining when an unlawful seizure occurs: "when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable

suspicion." *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez*, 575 U.S. at 357–58). We hold that Carson fails at the last prong.

Carson argues that Corthell detoured from Washington's suspended license investigation by "(1) researching whether the Highlander was involved in any past crimes; (2) checking the registered owner's driving status, warrant status, and criminal history, without knowing if that owner was present; and (3) discussing getting a narcotics-detection dog to the scene." Appellant's Br. (ECF No. 15) at 32–33 (hereinafter "Opening Br.").[4] But even assuming those actions are detours, they occurred after or contemporaneously with Hayes developing an independent reasonable suspicion to extend the stop and therefore did not unlawfully prolong the stop so as to require the suppression of evidence.

As stated above, Hayes testified that at 11:25:52 p.m., he detected the marijuana odor from the Highlander's rear driver's side window. *See* J.A. 274. It is undisputed that Hayes had reasonable suspicion upon detecting the marijuana odor. *See United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) (holding that "the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place"). Carson conceded as much, telling the magistrate judge that if the district court credited Hayes' testimony that he detected the odor of marijuana when he was beside the rear driver's side door at 11:25:52 p.m., then under current circuit precedent, "probable cause to search the vehicle accrued at that time." J.A. 401–03. At that point, the reasonable duration and mission of the stop evolved. So, the dispositive question is temporal: did the

---

[4] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

alleged detours occur after 11:25:52 p.m.?  If so, any potential detour was either after or contemporaneous with Hayes' development of an independent reasonable suspicion and therefore did not unconstitutionally extend the stop.  *See Palmer*, 820 F.3d at 650 (holding that after the officer smelled marijuana, the appellant had to show a constitutional violation between the time the stop began and the point that the officer smelled marijuana).

The district court found that all three of the purported detours occurred contemporaneously or after Hayes developed reasonable suspicion "only a few minutes after the stop was initiated," and therefore did not impermissibly extend the stop.  At the outset, the discussion between Corthell and DeStefano about obtaining a drug-detecting dog happened at 11:27:43 p.m., a couple of minutes *after* Hayes detected the odor of marijuana.  *See* J.A. 121 (DeStefano testifying that at "11:27 and 43 seconds," he and Corthell discussed whether to bring in a drug-sniffing dog).

That leaves only Corthell's investigation of the Highlander and its registered owner's driving status.  Corthell testified that at 11:25:22 p.m., he was walking back to his patrol car.  *Id.* 218.  This is 30 seconds before Hayes detected the odor of marijuana at 11:25:52 p.m.  Despite Carson's contentions, a few details make it nearly impossible for Corthell to have conducted any alleged detour in that 30-second period.

At 11:25:22 p.m., Corthell was not yet back at his patrol vehicle, where any investigation or computer-based research would have begun.  After entering his vehicle, Corthell testified that he was logged out of his CJLEADS account and therefore had to complete a two-factor authentication process, which required logging in and verifying a separate security prompt before gaining access.  *Id.* 199–200.  Once Corthell was fully

12

logged into CJLEADS, he first entered Washington's name and identification number. *Id.* 200–01. Once he did so, he looked for Washington's address, date of birth, and information about why he did not have a valid driver's license. *Id.* 203. He also checked for any active warrants and investigated Washington's criminal history, noticing that Washington's criminal history prompted several system warnings, including that he was a felon with previous drug offenses, and that the police should approach him with caution. *Id.* 204.[5] Corthell testified that after completing his investigation into Washington, he then investigated whether the Highlander had been involved in any past crimes and checked the registered owner's driving status, warrant status, and criminal history *See id.* 201, 211.

Taken together and in the light most favorable to the Government, these steps involve multiple sequential actions that could not have been completed within the required 30-second window. In other words, Corthell's alleged detours occurred either after Hayes' detection of marijuana, or simultaneously. Accordingly, the district court did not reversibly err by finding that an independent reasonable suspicion existed to extend the stop because "while Corthell was writing the traffic citation, another officer detected the smell of marijuana."[6] *Id.* 492.

---

[5] Carson does not dispute that the inquiries into Washington by Corthell were related to the mission of the traffic stop. *See* Opening Br. at 32–33. And *Rodriguez* permits an officer to investigate a driver's license and whether there are outstanding warrants against the driver. 575 U.S. at 355.

[6] Carson contends that our holding today would contravene with our court's recognition of the collective knowledge doctrine. *See* Opening Br. at 39–40. We disagree. In *United States v. Massenburg*, the court explained that "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient (Continued)

B.

Next, we address the constitutionality of Escobedo's frisk of Carson. The Fourth Amendment authorizes a police officer to frisk a detainee for weapons if "two requirements" are met. *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc). First, the officer must have "conducted a lawful stop, which includes both a traditional *Terry* stop as well as a traffic stop." *Id.* at 698, 700. Second, during the encounter, the officer must "reasonably suspect that the person is armed and therefore dangerous." *Robinson*, 846 F.3d at 700. In *United States v. Sakyi*, this court held that when, in connection with a lawful traffic stop, "the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others." 160 F.3d 164, 169 (4th Cir. 1998).

Here, we hold that both frisk requirements are met. First, under the Fourth Amendment, the officers had the right to stop Carson as an occupant of the Highlander for a traffic violation. *See Brendlin v. California*, 551 U.S. 249 (2007) (holding that "[w]hen police make a traffic stop, a passenger in the car, like the driver, is seized for Fourth Amendment purposes"). And second, under *Sakyi*, Escobedo could frisk Carson briefly for weapons to ensure his safety and others because he had reasonable suspicion that

---

information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." 654 F.3d 480, 492 (4th Cir. 2011). But here, Hayes' reasonable suspicion was not imputed to Corthell. Hayes himself developed reasonable suspicion that was independent from the traffic stop's mission which justified further investigation and extension of the stop.

14

marijuana was in the Highlander.  *See* 160 F.3d at 169; *see also United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) (reaffirming that under *Sakyi*, "an officer who has reasonable suspicion to believe that a vehicle contains illegal drugs may order its occupants out of the vehicle and pat them down for weapons").

## III.

Accordingly, the district court's denial of Carson's motion to suppress is

*AFFIRMED.*

15

BERNER, Circuit Judge, concurring:

I concur in all but Section II.A of the majority opinion and concur in the judgment. I write separately to emphasize two points about our binding precedents in *United States v. Sakyi*, 160 F.3d 164 (4th Cir. 1998) and *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011). I address each in turn.

I.

With respect to whether Detective Escobedo had reasonable suspicion to frisk Carson, I agree with my colleagues that our precedent in *United States v. Sakyi* dictates the outcome of this case. 160 F.3d 164, 169 (4th Cir. 1998). *Sakyi* created a presumption that a police officer has reasonable suspicion to frisk a suspect for a weapon during a traffic stop when he reasonably suspects that there are illegal drugs in the car. *Id.* Applying this binding precedent, we are left with no choice but to conclude that Escobedo frisking Carson for weapons did not violate Carson's Fourth Amendment rights because Escobedo reasonably suspected that there was marijuana in the car. The *Sakyi* presumption rests on a simple premise: "where there are drugs, there are almost always guns[.]" *Id.* at 170 (quoting *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997)). This premise—that an individual who is suspected of being in proximity to illicit drugs is likely carrying a gun— can no longer hold water in this era of widespread marijuana legalization.

In the nearly thirty years since *Sakyi* was decided, the purported nexus between marijuana use and gun possession has become attenuated. Indeed, the Government conceded as much at oral argument. *See* Oral Argument at 27:150 ("Whether or not we can assume that someone who is violating the law because they are possessing a small user

amount of marijuana or whatever—whether or not that suggests that they are automatically dangerous—that might be something that this court at some point will reconsider.").

The legal landscape around marijuana use, both medical and recreational, has shifted considerably both at the state and federal level. Forty-seven states and the District of Columbia now allow the use of marijuana for medical purposes. Cong. Rsch. Serv., *State Marijuana "Legalization" and Federal Drug Law: A Brief Overview for Congress*, https://www.congress.gov/crs_external_products/LSB/PDF/LSB10482/LSB10482.4.pdf [https://perma.cc/4ZQU-ERJT]. Twenty-four states, including a number within the Fourth Circuit itself, have legalized recreational marijuana use. *Id.* Though federal law continues to criminalize marijuana, the federal government "has largely tolerated the production and sale of marijuana when done in accord with state law, and it has allowed a multi-billion-dollar marijuana business to develop." *United States v. Hemani*, 608 U.S. -- , at *18 (2026) (Alito, J., concurring). This year, the Federal Food and Drug Administration formally reclassified products containing marijuana from Schedule I controlled substances, the most restrictive category, to Schedule III controlled substances. Schedules of Controlled Substances: Rescheduling of Food and Drug Administration Approved Products Containing Marijuana from Schedule I to Schedule III; Corresponding Change to Permit Requirements, 91 Fed. Reg. 22714-01 (Apr. 28, 2026) (to be codified at 21 C.F.R. pts. 1300, 1301, 1308, 1312).

This legal shift is also reflected in evolving social attitudes towards the use of marijuana. Sixty-four million Americans reported using marijuana at least once in the past year. Substance Abuse and Mental Health Servs. Admin., *Key Substance Use and Mental*

17

*Health Indicators in the United States: Results from the 2024 National Survey on Drug Use and Health*, https://www.samhsa.gov/data/sites/default/files/reports/rpt56287/2024-nsduh-annual-national-report.pdf [https://perma.cc/83D3-2BT9].

*Sakyi* relies on an assumption that individuals using and dealing illicit drugs are likely to be carrying guns for protection while engaged in illegal drug transactions. *Sakyi*, 160 F.3d at 169. Against the backdrop of changes in federal law and widespread state legalization, such safety concerns are now notably absent for many marijuana users. An individual in Maryland, for example, can walk into a dispensary and legally purchase marijuana with no need for the type of protection upon which *Sakyi* based its nexus analysis.

The facts of this case demonstrate this unassailable attenuation between marijuana use and dangerousness. The officers themselves repeatedly assured Carson and the other occupants of the car that they were "not the weed police." [Media at 23:28:39–29:32] Indeed, even though marijuana remains unlawful in North Carolina, the Asheville Police Department no longer charges individuals who possess personal use amounts of marijuana. *See* J.A. 136–37. This approach follows the lead of the Department of Justice which directed federal prosecutors to forgo marijuana prosecutions over a decade ago. *Hemani*, 608 U.S. at *11.

The "[s]eismic changes" in the regulatory environment and cultural acceptance of marijuana put the Government in the "awkward" position of suggesting that "millions of Americans who now regularly use marijuana are categorically and unusually dangerous." *Id*. The Supreme Court's recent decision in *United States v. Hemani* underscores the need

18

to revisit our presumption. *Id.* There, the Court held unconstitutional a statute criminalizing firearm possession as applied to occasional marijuana users. *Id.* The Court explicitly rejected that a link between dangerousness and marijuana use could be sustained in view of the evolving legal and social landscape. *Id.* Yet, under the law of our circuit, reasonable suspicion to frisk for weapons continues to be presumed *anytime* a police officer even so much as detects the smell of marijuana.

Though *Sakyi* left open the possibility that its presumption could be rebutted, 160 F.3d at 169 (providing that the presumption may not apply where there are "factors allaying [the officer's] safety concerns"), in practice this court has treated it as irrebuttable. *See e.g.*, *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (holding that the smell of marijuana in a car provided probable cause to search the car); *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) (same). This *per se* approach means that within our circuit "police can generally escalate any drug-based *Terry* stop into a highly intrusive *quasi*-arrest without even a reasonably particular suspicion of danger." *United States v. Devaugh*, 422 F. Supp. 3d 104, 116 (D.D.C. 2019).

This approach stands in contrast to decisions from our sister circuits. Some circuits limit the presumption to situations in which the police reasonably suspect *drug trafficking*, not merely personal use. *See, e.g.*, *United States v. Garcia*, 459 F.3d 1059, 1064–65 (10th Cir. 2006); *United States v. Davis*, 726 F.3d 434, 440 (3d. Cir. 2013). Other circuits treat reasonable suspicion of a drug crime as only one factor in a totality-of-the-circumstances test to determine whether there was reasonable suspicion to frisk a suspect. *See, e.g.*, *United*

19

States v. Dubose, 579 F.3d 117, 122 (1st Cir. 2009); *United States v. Salazar*, 945 F.2d 47, 51 (2d. Cir. 1991); *United States v. Colbert*, 54 F.4th 521, 527–28, 531 (7th Cir. 2022).

It is axiomatic that a panel of this court cannot overrule a prior panel opinion absent contrary authority from the Supreme Court. *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023). Only the court sitting *en banc* may do so. *Id.* Accordingly, we are bound by *Sakyi*, and I join my colleagues in their carefully reasoned opinion. I write separately to underscore that our current presumption has the practical effect of stripping those who use marijuana, even in states where it has been legalized under state law, and even individuals who simply find themselves in near proximity to others using marijuana, of their Fourth Amendment right against unreasonable search and seizure. As laws and social mores regarding marijuana continue to evolve, this presumption may no longer survive constitutional scrutiny.

## II.

As the majority articulates, we apply a three-prong test to determine when an unlawful seizure occurs: "when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 357–58 (2016). I agree that Special Agent (S.A.) Corthell's investigative detours did not unlawfully prolong the stop. Carson's challenge therefore fails at the second prong of the analysis.

20

The reasonable duration of a traffic stop "is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop[.]" *Rodriguez*, 575 U.S. at 354. This requires a fact-specific analysis of the officers' conduct on the scene to determine whether the duration was reasonable. *Id.* Even a *de minimis* extension of a traffic stop can violate the Fourth Amendment absent an officer's reasonable suspicion of criminal activity or the driver's consent to lengthen the stop. *United States v. Williams*, 808 F.3d 238, 245–47 (4th Cir. 2015).

Here, the initial purpose of the traffic stop was to issue a citation for driving without a license. After Officer Hayes smelled marijuana and saw drug paraphernalia in the car, however, the reasonable duration of the traffic stop was extended. To prevail on his motion, Carson would have to demonstrate that S.A. Corthell's detours measurably extended the stop beyond what would have been necessary for Officer Hayes to conduct his investigation into the drug paraphernalia. The facts in this case do not support such a conclusion.

Officer Hayes developed probable cause, "diligently pursued" his investigation, and communicated his concerns to the other officers in a reasonable time frame. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). The district court found that Officer Hayes detected marijuana simultaneously with S.A. Corthell's alleged detours. Given the contemporaneous development of probable cause coupled with the brevity of the stop, the district court did not err in concluding that S.A. Corthell's detours did not measurably extend the stop beyond its reasonable duration. *See Rodriguez*, 575 U.S. at 354–57.

The majority, by contrast, determines that Carson's challenge fails at the third prong: that the investigative detours were supported by independent reasonable suspicion.

21

The majority bases its conclusion, however, not on S.A. Corthell's own independent reasonable suspicion to support his investigative detour, but rather on Officer Hayes's observations about the smell of marijuana and drug paraphernalia in the car, neither of which he had communicated to S.A. Corthell. The majority is incorrect because this court's ruling in *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011), requires a different result.

In *Massenburg*, the Government argued that the knowledge of *all officers* on scene should be viewed together by a court analyzing whether an *individual officer* had reasonable suspicion to justify a frisk. *Massenburg* rejected this approach. *Massenburg*, 654 F.3d at 495. Rather, in analyzing whether an individual officer's search was supported by reasonable suspicion, *Massenburg* instructs that we may look only to the information the individual officer had at the time he conducted the search. *Id.* Information gleaned from another officer on the scene that is "not known" to the acting officer at the time of the search is "irrelevant" for purposes of Fourth Amendment reasonable suspicion analysis. *Id.*

The parties do not dispute that Officer Hayes only communicated his suspicions to S.A. Corthell *after* S.A. Corthell undertook the investigative detours. In accordance with *Massenburg*, Officer Hayes's development of probable cannot be relied upon *ex post-facto* to support a finding that reasonable suspicion justified S.A. Corthell's detours. Rather the question is whether the information known to S.A. Corthell at the time provided reasonable suspicion of criminal activity to support his investigative detours.

This approach corresponds with the purpose of the exclusionary rule, deterring Fourth Amendment violations. *Davis v. United States*, 564 U.S. 229, 236–37 (2011). The

22

majority's approach, by contrast, creates the exact perverse incentive that *Massenburg* cautioned against.

> Because it jettisons the present requirement of communication between an instructing and an acting officer, officers would have no way of knowing before a search or seizure whether the aggregation rule would make it legal, or even how likely that is. The officer deciding whether or not to perform a given search will simply know that she lacks cause; in ordinary circumstances, she will have no way of estimating the likelihood that her fellow officers hold enough uncommunicated information to justify the search. And as an officer will never know *ex ante* when the aggregation rule might apply, the rule does not allow for useful shortcuts when an officer knows an action to be legal . . . Perhaps an officer who knows she lacks cause for a search will be more likely to roll the dice and conduct the search anyway, in the hopes that uncommunicated information existed. But as this would only create an incentive for officers to conduct searches and seizures they believe are likely illegal, it would be directly contrary to the purposes of longstanding Fourth Amendment jurisprudence.

*Massenburg*, 654 F.3d at 494.[*]

S.A. Corthell's investigative detours cannot be supported by Officer Hayes's uncommunicated information. In holding otherwise, the majority runs afoul of this court's precedent.

---

[*] The majority attempts to distinguish *Massenburg*, stating that "Hayes's reasonable suspicion is not imputed to Corthell. Hayes himself developed reasonable suspicion that was independent from the traffic stop's mission which justified further investigation and extension of the stop." Maj. Op. n. 6. This analysis conflates two separate prongs of our analysis. At the third prong of the analysis, we consider whether independent reasonable suspicion justified the investigative detour, not whether independent reasonable suspicion existed to prolong the stop. This distinction is perhaps subtle, but it is important. While Officer Hayes's development of probable cause changed the reasonable duration of the stop (prong two of the analysis), it cannot be used to justify S.A. Corthell's investigative detours (prong three of the analysis).